Westlaw.

Not Reported in F.Supp.2d                                                                                                 Page 1
Not Reported in F.Supp.2d, 2003 WL 22999541 (D.Del.)
**(Cite as: 2003 WL 22999541 (D.Del.))**

▶
Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
Lorraine G. HARRIS-THOMAS, Plaintiff,
v.
CHRISTINA SCHOOL DISTRICT, Defendant.
No. Civ.A. 02-253-KAJ.

Dec. 18, 2003.

Lorraine G. Harris-Thomas, Newark, Delaware, pro se.

Daniel P. Bennett, Heckler & Frabizzio, Wilmington, Delaware, for defendant Christina School District.

MEMORANDUM OPINION

JORDAN, J.

I. INTRODUCTION

*1 On April 5, 2002, pro se plaintiff, Lorraine G. Harris-Thomas, filed this civil rights action, pursuant to 42 U.S.C. § 1983, on behalf of herself and her minor son, Isaac Harris. (Docket Item ["D.I."] 1.) She alleges that the defendant, Christina School District (the "School District" or the "Defendant"), discriminated against Isaac on the basis of race, in violation of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq. (D.I.6.) She further alleges that the Defendant denied Isaac due process, and impermissibly infringed upon his protected liberty interests, in violation of the Fourteenth Amendment of the U.S. Constitution. (Id.) Presently before me is the School District's Motion for Summary Judgment. (D.I. 66; the "Motion".) For the reasons that follow, the Motion will be granted.

II. BACKGROUND

In early April, 2000, Isaac Harris, an African-American, transferred into the seventh grade at Kirk Middle School, a school within the School District. (D.I. 6 ¶ 7.) [FN1] During homeroom period, at about 2 p.m. on April 5, 2000, Isaac got into a physical fight with a white student named Bryan Thomas. (Id. ¶ 10.) The homeroom teacher, Erin Noonan, who is white, saw the two students fighting and intervened. (Id. ¶ 12.) When her verbal efforts to stop the fight failed, Ms. Noonan attempted to break up the fight physically by pushing Isaac off of Bryan. (Id. ¶ 13.) Ms. Noonan was struck on the right side of her head after inserting herself between Isaac and Bryan, (id. at 14), and she testified that there is "no doubt in [her] mind ... that [she] was hit by Isaac" (D.I. 68 at A-17).

> FN1. D.I. 6 is plaintiff's Amended Complaint, filed on July 1, 2002.

Apart from Ms. Noonan, two other students witnessed the fight. (Id. ¶ 15.) One of the student witnesses, who is white, agreed with Ms. Noonan's account that Isaac punched Ms. Noonan on the right side of her head. (Id. ¶¶ 17, 18.) The other student witness, who is African-American, submitted a written statement which said, "I saw Bryan punch Ms. Noonan on her ear, she was red ... It looked like Ms. Noonan got punched in the head but I didn't see it that clearly." (Id. ¶ 19; D.I. 69, Exh. 1.)

Immediately after the incident, Kirk Middle School's principal, Dave Nichols, asked Isaac to write down the events leading up to and including his fight with Bryan. (D.I. 68, A-21 to A-26.) Isaac's handwritten and signed account of the fight reads as follows:

> This is what happen [sic]. I was playing with Kale English. Me and him was talking about Pokemon when the other kid interrupted and I said shut up. He must have got offended and swung his

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 2

Not Reported in F.Supp.2d, 2003 WL 22999541 (D.Del.)

**(Cite as: 2003 WL 22999541 (D.Del.))**

bookbag. It hit me in the head and neck. After that I pushed him. He pushed me back into the wall. He put my head down and started punching me in the neck. I pushed him and threw to [sic] punches to the ribs. I backed up and the teacher grabed [sic] me. During that I threw three punches one nip[ped] Mrs. Noonan. After that he tried to move away. I thrown [sic] a punch missed and two other people grabbed me and sent me to the office.

*2 (D.I.69, Exh. 5.) Mr. Nichols left a phone message for Ms. Harris-Thomas at 2:20 p.m. and spoke to Bryan's mother on the phone at 2:30 p.m. regarding the fight. (D.I.68, A-26.) Mr. Nichols and Anthony Puella, Kirk Middle School's safety liaison, further investigated the incident, which included re-enacting the fight with Ms. Noonan. (*Id.* ¶ 23.) At the end of the investigation, Mr. Nichols concluded that Isaac had punched Ms. Noonan as she attempted to break up the fight. (D.I. 68, A-26 to A-28.)

The School District's Student Code of Conduct (the "Code") defines fighting as "[a]ggressive, physical conflict between two or more individuals assaulting each other, including wrestling and shoving." (D.I. 16, Exh. A at 37.) Fighting is a Level II violation for students in grades 7 through 12. (*Id.*) The consequences of fighting, if it is a student's first offense, are "(1) parent/guardian notification, (2) suspension for three days, (3) parent/guardian conference, (4) restitution/restoration if necessary, and (5) referral to mediation." (*Id.*) Bryan, the white student, was disciplined for fighting and received a three day suspension. (*Id.* ¶ 28.)

The Code defines assault as "[a]n unlawful attack using force upon a person resulting in physical injury." (D.I. 16, Exh. A at 44 .) Assault is a Level III violation for students in grades 7 through 12. (*Id.*) The consequences of each offense of assault are "(1) parent/guardian notification, (2) suspension for five days, (3) parent/guardian conference, (4) notification of police; charges may be filed, (5) restitution/restoration, if necessary, (6) recommendation to appropriate counseling or social service agency, (7) possible recommendation for alternative placement or expulsion, and (8) referral to mediation, if appropriate." (*Id.*) Because he struck Ms. Noonan, Isaac was disciplined for assault, and received a five day suspension. (*Id.* ¶ 30.)

Mr. Nichols is required to report every assault upon a teacher to the Alternative Placement Committee (the "APC") in the Christina School District. (D.I. 68, A-32 to A-33.) Ms. Harris-Thomas and Kirk Middle School were both given an opportunity to present evidence at a hearing before the APC concerning Isaac's future placement. (*Id.*) On April 17, 2003, the APC concluded that Isaac had struck Ms. Noonan, (*id.*), and Isaac was assigned to an alternative school program called "New Beginnings" for the remainder of the academic school year (D.I. 6 ¶ 42). [FN2]

> FN2. Isaac returned to Kirk Middle School for eighth grade, and he is now a ninth grade student at a high school within the School District. (D.I. 68 at A-2.)

Pursuant to Delaware House Bill 85, defendant was also required to report the assault to the Delaware State Police and to file assault charges against Isaac. *See* 69 Del. Laws 120 (1993) ("In any instance where a pupil is found to have committed an assault ... against a school employee ... the principal shall immediately report such incident to the appropriate local police agency and to the superintendent ... [and] ... file the appropriate charge against the pupil...."). [FN3] After a trial in Family Court, on October 18, 2000, Isaac was adjudicated delinquent of assault and disorderly conduct. (D.I. 68 at A-45.) He was also committed to the "Back on Track" program of the Division of Youth Rehabilitative Services for one year. (D.I. 68 at A-46.)

> FN3. Plaintiff has argued that House Bill 85 affected more black students than white students during the 1999-2000 academic year at Kirk Middle School. (D.I. 69 at 16.) Plaintiff's focus is misplaced. House Bill 85 was implemented by the Delaware legislature, not the Defendant. Further, plaintiff's assertions do not rise to the level

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 3

Not Reported in F.Supp.2d, 2003 WL 22999541 (D.Del.)

**(Cite as: 2003 WL 22999541 (D.Del.))**

of statistical analysis necessary for claims of disparate impact, and, even if they did, such a claim is not actionable under Title VI, as discussed *infra,* footnote 4.

*3 In January, 2001, Ms. Harris-Thomas filed a complaint against the School District with the United States Department of Education, Office for Civil Rights (the "OCR"). (D.I. 6 ¶ 51.) The OCR conducted an investigation and "determined that there is insufficient evidence to find that [defendant] discriminated against [Isaac] on the basis of race as alleged in the complaint." (D.I.68, A-48.) Specifically, the OCR found that Isaac "was disciplined more severely than the white student due to the severity of his misbehavior, and not his race." (*Id.* at A-49.) Thereafter, Ms. Harris-Thomas instituted this lawsuit.

III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 states that summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2003); *Saldana v. Kmart Corp.,* 260 F.3d 228, 231-32 (3d Cir.2001). The court will view all facts and draw all reasonable inferences in favor of the non-moving party. *Id.* at 232. However, the party opposing summary judgment may not rely on the allegations in her pleadings; instead, through "more than a scintilla" of evidence, she must present "specific facts showing that there is a genuine issue for trial." *Id.*

IV. DISCUSSION

A. *Title VI*

Plaintiff alleges civil rights violations under Title VI of the Civil Rights Act of 1964, specifically, that defendant intended to discriminate against Isaac on the basis of his race. (D.I. 6 ¶ 64.) Title VI provides a private cause of action for intentional discrimination only. *Pryor v. NCAA,* 288 F.3d 548, 554 (3d Cir.2002) (citing *Alexander v. Sandoval,* 532 U.S. 275, 281 (2001)). To prove intentional discrimination by a facially neutral policy, a plaintiff must show that the relevant decisionmaker adopted the policy at issue "because of," not merely "in spite of," its adverse effects upon an identifiable group. *Id.* (citing *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 279 (1979)). A mere awareness of the consequences of an otherwise neutral policy will not suffice. [FN4] *Id.*

> FN4. Defendant has analyzed plaintiff's case using the burden-shifting framework of *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973); that analysis would be relevant if this were a case of employment discrimination based on race, but it is not applicable in this context.

There is no question that the Defendant's Student Code of Conduct is facially neutral, since it does not, on its face, discriminate against any identifiable group or minority. *Id.* at 563. The remaining issue, then, is whether the Defendant adopted the Student Code of Conduct with an intent to discriminate against African-American students. Plaintiff has offered no evidence that the Student Code of Conduct was adopted "because of" its adverse effects upon African-American students. [FN5] Therefore, plaintiff has not sustained her burden of proving that defendant intended to discriminate against African-American students by adopting a facially neutral policy. [FN6] As there are no genuine issues of material fact, summary judgment for defendant will be granted on plaintiff's Title VI cause of action.

> FN5. Even though plaintiff has not alleged that the facially neutral policies in the Defendant's Student Code of Conduct have a disparate impact on African-American students, it is worth nothing that such a cause of action does not lie under Title VI. This is because "Title VI itself directly reaches only instances of intentional discrimination," and thus, creates no claim for disparate impact. *Sandoval,* 532 U.S. at 281; *accord Pryor,* 288 F.3d at 554. In

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 4
Not Reported in F.Supp.2d, 2003 WL 22999541 (D.Del.)
**(Cite as: 2003 WL 22999541 (D.Del.))**

other words, "a facially neutral policy does not violate equal protection solely because of disproportionate effects." *Pryor,* 288 F.3d at 562 (citing *Stehney v. Perry,* 101 F.3d 925, 937 (3d Cir.1996)).

FN6. Plaintiff was asked repeatedly at her deposition what evidence she had to prove that Isaac was "singled out" because of his race, and she was unable to set forth specific evidence to support her allegations. (D.I. 68 at A-39 to A-43.)

B. *Fourteenth Amendment*

*4 Plaintiff also alleges that the Defendant violated Isaac's Fourteenth Amendment procedural due process rights by suspending him without a hearing. (D.I. 6 ¶ 72, 75.) The requirements of procedural due process for suspension of students were set forth in *Goss v. Lopez,* 419 U.S. 565 (1975). In *Goss,* the Supreme Court concluded that a student facing a suspension of ten days or less must be given oral or written notice of the charges against him, and a student who denies the charges must be given an explanation of the evidence the authorities have and an opportunity to present his side of the story. 419 U.S. at 581. There need be no delay between the time the notice is given and the time of the hearing. *Id.* at 582. In the majority of cases, "the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred." *Id.*

The record here reflects that Mr. Nichols talked to Isaac immediately after the fighting incident. He asked Isaac to prepare a written statement concerning the fight and then discussed that statement with him. (D.I. 68 at A-25.) The record also reflects that Isaac understood the nature of his meeting with Mr. Nichols. (D.I. 68 at A-7.) The Student Code of Conduct, which was applicable to all students, clearly defined assault and specified that such an offense would result in a five day suspension from school. (D.I. 16, Exh. A at 37, 44.) Because Mr. Nichols and Isaac discussed his misconduct prior to Isaac's five-day suspension, and given that the Student Code of Conduct set forth the consequences of an assault offense, Isaac was not denied procedural due process. [FN7] *See S.G. v. Sayreville Board of Education,* 333 F.3d 417, 424 (3d Cir.2003) (school principal's meeting with student before imposing suspension and having discussion where student admitted to violative behavior fulfilled requirements of due process); *see also Palmer v. Merluzzi,* 868 F.2d 90, 94-5 (3d Cir.1989) (when possible sanctions are known from previously published materials, student need not be advised of penalties in a *Goss* situation).

FN7. Mr. Nichol's inability to reach Ms. Harris-Thomas on the phone does not signify that Isaac was deprived of due process. *Sayreville,* 333 F.3d at 424.

Plaintiff also alleges that defendant denied Isaac a protected liberty interest "against improper disciplinary actions" in violation of the Fourteenth Amendment. (D.I. 6 ¶ 75.) As discussed above, defendant did not violate Isaac's right to procedural due process before he was suspended. Further, Isaac has not suffered any consequences for his assault on Ms. Noonan beyond the scope of those set forth in the Student Code of Conduct. Therefore, there is no evidence in the record that plaintiff was subject to any improper disciplinary actions at the hands of defendant.

C. *State Law Claim*

Finally, plaintiff alleges that Ms. Noonan filed criminal charges against Isaac in order to embarrass, humiliate, and inflict severe emotional distress upon him. (D.I. 6 ¶ 84.) Plaintiff claims that Ms. Noonan filed these charges on April 7, 2000, (D.I. 6 ¶ 61), though it appears from the record that the charges were actually filed by Mr. Nichols, pursuant to his obligation under House Bill 85. Regardless, there is no evidence in the record to support plaintiff's allegation that anyone intentionally filed assault charges against Isaac with an improper motive. Summary judgment for defendant will also be entered with respect to plaintiff's claim of intentional infliction of emotional distress.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 5
Not Reported in F.Supp.2d, 2003 WL 22999541 (D.Del.)
**(Cite as: 2003 WL 22999541 (D.Del.))**

V. CONCLUSION

*5 For the reasons set forth herein, defendant's Motion for Summary Judgment (D.I.66) will be granted. An appropriate Order will issue.

Not Reported in F.Supp.2d, 2003 WL 22999541 (D.Del.)

**END OF DOCUMENT**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.